Thank you. May I reserve three minutes for rebuttal? Yes. May it please the Court, Eric Hamilton for the Plaintiff States. Defendants' Federal Contractor Minimum Wage imposes billions of dollars in new costs on the government's contracting partners, all on the assertion that nebulous morale-raising benefits will offset that substantial cost. The Procurement Act does not authorize the President to impose a nationwide Federal Contractor Minimum Wage, but even if it did, defendants' rule violated the APA, the district court erred in failing to enter a preliminary injunction. There are a number of problems with the wage mandate. I want to start with an argument that would have been inconsistent with the now vacated Mays decision. That's the threshold issue of whether Section 101 expands Section 121's grant of presidential power. The answer is no. Section 101 is a purpose clause. It memorializes Congress's purpose in enacting the Procurement Act. Two circuits, the Sixth Circuit and Eleventh Circuit, have both accepted this argument in construing the Procurement Act. And recently, the Southern District of Texas, in entering a permanent injunction against the Federal Contractor Minimum Wage, also accepted this argument. But, Mr. Hamilton, before you continue, and I do want to hear more about this argument, this was not raised below, as I understand it, and both of those decisions had already been issued when you were in the district court below. Aren't we constrained from hearing this new argument that was not raised below? No, Your Honor. A few points. One, this argument is antecedent to the arguments that we did make in the district court, and the district court appeared to recognize that because there's even a parenthetical on page 11 of the excerpts of record, which is the district court's opinion, that flags this issue. And is the U.S. Supreme— The issue about the purpose clause? Yes, yes. There's a parenthetical that describes Judge Grant's opinion from the Eleventh Circuit. Judge Grant has the lead opinion in the Eleventh Circuit case that adopts this argument. So that parenthetical recognizes that this issue is antecedent to the arguments we were making, and under the U.S. Supreme Court's LeBron decision, which we discuss in our brief at page 16, the fact that that is enough to preserve the issue. You clearly argued that there was a statutory authority, right? Yes. So the question here is just how many arguments did you raise, and did you raise this specific purpose? That's right. That's right. And even if the court did consider it to be a forfeited issue, that, of course, is a discretionary doctrine, and it would be appropriate to consider the issue here where the issue is briefed and the district court, I don't think, was prejudiced since it clearly had awareness of the issue. Even if there was a link between Section 101 and Section 121, the president's authority would still be limited to making improvements for the procurement system. Section 101 talks about the purpose is to provide the federal government with an economical and efficient system for contracting, and that would align the statute with its purpose, which came as a response to World War II duplication and inefficiency in contracting. But nothing out of the 1949 Procurement Act had the purpose of improving individual contractor obligations. Can I ask a question? The parties both, the plaintiffs, in fact, seemed to concede that the Department of Labor found that the costs, that the benefits outweighed the costs. Is that your position? Because as I read it, I thought the labor order actually found the opposite, that the costs outweighed the benefits. From my understanding, the wage mandate rule is saying that the benefits are going to outweigh the costs. Maybe. Is that economic benefits, or those are other intangible benefits are going to outweigh the costs? It's combined. So there are three pages in the wage mandate rule, pages 67 to 10. I'm sorry, they're at pages 67 to 12 to 15, and they go through various benefits. And the Pacific Legal Foundation brief really dissects everything that is cited in these three pages. But they cite studies showing that morale is going to go up if people have additional wages, that turnover will go down, and they also discuss several benefits that have nothing to do with economy and efficiency, things like increased equity and reduced poverty and income inequality. Those are social policy goals. Okay, so I agree with that. My question is more specific, and maybe we're just looking at the question differently. As to actual costs, did the Department of Labor find that the costs to the government were going to increase or decrease based on this rule? I think it very strongly suggested that those costs would go up, because the department talks about how there are going to be new costs imposed on the government's contracting partners, and that it's quite likely that the government is going to end up absorbing a lot of those costs. So when you say that the Department of Labor found that the costs outweighed the benefit, the only way to achieve that result would be not by looking at the financial costs, because it seems like the government's going to have to pay more money, and they're saying that's okay because we're getting these other intangible benefits which outweigh that. Yes, yes, that's right. I think the government's position is that there are the – I'm sorry, but I thought the Department of Labor – so the justifications by the Department of Labor, increased productivity, lower turnover, those are also offsetting benefits that are quantifiable, I guess, in their view, right? So there are certain increased costs that I thought the Department of Labor said would increase in the short term. I think it said negligible. I forget. You can correct me. But it was offset by benefits or lowering costs from productivity, lower turnover, less absenteeism. Aren't we looking at economic versus economic or no? Did I misunderstand that? No, I agree. It is an economic analysis. I think in the end, the economy and efficiency analysis requires something like a cost-benefit analysis, and that's consistent with the D.C. Circuit's Kahn decision, which looked at an order that was the opposite of this order. It was an order that had the effect of putting caps on wage and price increases from federal contractors. And the D.C. Circuit, in the end, said, on the whole, this is going to have the effect of holding down the federal government's costs. And the very end of Kahn's analysis, in Roman II, emphasizes that connection to holding down the costs. And two judges filed concurring opinions, emphasizing that strong connection between the reduced expenses for the government and the order under consideration there. Can I ask you this? I was struggling with this. This is a nexus. So we're to look at the nexus between the order and the goals of economy and efficiency. But it almost seems to me as if you're arguing a policy disagreement. And the question I have is, how are we three judges equipped to decide whether you're right or the Department of Labor is right? Aren't we talking about a policy dispute as opposed to whether there's a sufficient nexus between the order and the goals? No, not at all, Your Honor. I mean, really, it's the same analysis that I think this court does regularly when considering whether an agency has acted within some statutory grant of authority. The fact that Section 121 delegates power to the president as opposed to an agency doesn't change that. And in the U.S. Supreme Court's Chrysler Court against Brown decision, it talked about this standard. It said there has to be a nexus. And it said that the policy must be reasonably within the contemplation of the statute. And, again, you know, I think cases like Kahn, Liberty Mutual, and the Fourth Circuit, courts of appeals have applied this standard and done that tradeoff in cost-benefit in previous Procurement Act cases. So I guess I have a follow-on question to that. What are we supposed to make of the policy judgments that Congress has made in this space? We have the Services Contract Act that says for federal contracts you've got to do the federal minimum wage. We have a couple of other specific statutes that deal with, you know, particular sectors of federal contracts that set wage standards. So clearly Congress has exercised its policy judgment in this space. What are we supposed to make of that in terms of assessing this executive order? Yes, Your Honor. Those statutes are very significant because they show that Congress has already made a judgment on the precise policy question that the wage mandate addresses. And Congress's statutes, at a minimum, make it very implausible that Congress intended to create this open-ended authority in Section 121 that would allow the President to make his own different judgment on the exact same policy question. And this is an argument that Texas in that Southern District of Texas case accepted last year, noting that those three statutes speak comprehensively to this problem. Did those statutes reflect a desire by Congress to say no one else should step into this area and also regulate in this field? Well, they don't override what states are doing in that space, but I think it's quite implausible that Congress would decide the policy question but then create this open-ended authority for the President to do something different and that imposes a conflicting minimum wage on federal contractors. Why is it conflicting? I think the opposing argument is you can comply with both. If there's a prevailing local wage in one area, that's higher. That would apply. If the President's order is the higher of the two in some other area, that would apply. So there's no direct conflict. But I guess you're basing it. It's almost as if you're arguing some sort of field preemption-type argument, but here. And I'm not. What case would you rely on in support of that type of context here? So I don't think the court has to think about it as a preemption case, but there is a previous case of the D.C. Circuit Chamber of Congress against Reich that struck down the Procurement Act ban on hiring permanent replacements during union strike that found a preemption issue there. But I think really it's just a matter of statutory interpretation. The specific governs the general, and there is a conflict because minimum, I mean, that's a term of limit, right? And this is setting the lower limitation. Congress did so in saying that prevailing wages control. But then the Procurement Act wage mandate comes in and says, well, there's a different nationwide limit that is now $17.20. And that's because it's increased over the last two years? Yes, Your Honor, yes. And is there any state that has a higher minimum wage? No, Your Honor. Every state has a lower minimum wage than the wage mandate. Go ahead. I want to come back to that we're doing a statutory construction here. I think that's ultimately what we're doing. If we were to conclude that the statement of purpose is not an authoritative grant of power, would it be appropriate for us to analyze this, the Procurement Act, to see if there might be some other grant of power that hasn't been raised in the briefing? Not absent the defendant citing some other authority, which they have not. And I think that just reflects the fact that the Procurement Act really doesn't have anything to do with what wages federal contractors have been paid. So why is that? I'm just focused on the interpretive exercise. Why is that so where we're on de novo review, we're a court of law, our job is to get the law right? So if we think that the parties have identified the wrong source of authority, why is it improper for us to see if there's some other grant of authority? Well, I just appreciate, I guess, the opportunity to provide supplemental briefing on any other possibly applicable authorities. I'm not aware of one, and I don't believe defendants have cited one. Have any other cases, there's been a few cases here, have any other cases cited to other provisions? I'm not aware of that. I'm not aware of that, right? I mean, the Eleventh and Sixth Circuits both looked at this threshold issue of whether 101 expands 121, and they considered some other issues in the alternative. But I don't recall them citing something else in the Procurement Act as a hook. I actually had that question. So in Georgia, the Eleventh Circuit case, they talk about the statutory structure. So you have 101, the purpose statement. 121 is the administration where it gives the president the authority to set policy and direction. Then Georgia talked about Title 41, which is the meat and bones of the Procurement Act. And one of those provisions is the ability, it's, I guess, Section 3101, that agencies have the authority to make purchases and contracts for property and services. I guess what I'm confused as to why isn't that the specific authority under which the president can direct policy? So if we're looking for a specific statutory provision that allows the president to direct, to make a direction, why isn't that it, the government's authority to contract with others and procure goods and services? I would still go back to the Procurement Act's overall purpose, which was to improve the efficiency and the organization of the federal government and how it engaged in contracting to eliminate duplication and create this centralized general services agency to be the hub for all of the government's contracting operations. I mean, I think if Congress had intended to govern minimum wages for individual contractors, it probably would have said something in the three statutes that actually talk about that issue and given the president an authority to supplement it there, as opposed to adding that authority. So your, just a quick follow-up, your argument is that there needs to be a specific statutory provision that allows the president to set wage orders within these contracts? Is that the argument you're making? Yeah, I'll give an example of a couple orders that are lawful under Section 121. One would be EO 11035, which set policies for how the federal government assigned spaces to agencies. One of the policies in that EO is don't rent out private space if you have public government space available, and the hook for that is 40 U.S.C. 584, which is part of the Procurement Act and actually conditions the GSA's assignment of space on a presidential Section 121 policy or directive. Another example is EO- in order to exercise discretion in that area or for the president to. So why isn't it enough that there's specific authority by an agency to contract with others and procure, and there's also specific authority that Congress has given the president to set directives to the agencies and the branches of government, why does there need to be something more specific that says the president must also be able to set wages within these contracts? I think Chrysler Corp. actually takes a narrower look than that, because that footnote 34 in Chrysler Corp., it copies and pastes Section 101's purpose clause, and then because the parties were litigating about an employment discrimination order, the Supreme Court says we don't see the term employment discrimination in here, and it strongly suggests that the Procurement Act would not have authorized the employment discrimination that was at issue in that case. In addition, the wage mandate violates the major questions doctrine, and that's because the imposition of a federal contractor minimum wage is a power of vast economic and political significance. That's the term that the U.S. Supreme Court standard that it has applied. I want to ask you, though, on the major questions doctrine, setting aside the argument you're just making, what do we do with the two prior orders? I mean, we've got President Trump and President Obama have both issued executive orders in a similar way under this authority. Doesn't that put this in a different camp than the West Virginia case, where it was kind of out of the gate, no one had ever thought of it before? No, Your Honor. The wage mandate order that President Biden has put in place is very different from either of those two previous wage mandates. The Obama order cost less than one-third as much as. . . Okay, but that's the cost. But I'm not necessarily disagreeing with you on the cost. I'm just saying it seems like this is different because there has been some activity in this area. Now, whether they were valid or not is a separate question because they were never challenged, but I just wonder whether the major questions doctrine applies in those circumstances. I still think it does. I mean, you look at the Procurement Act, it's a 75-year-old statute, and yet there has only been some sort of federal contractor minimum wage put in place by the President for the last 10 years. And as Your Honor indicated, there was no litigation over that, even though in comments to that Obama administration wage mandate rule, commentators did flag the legality problems with that rule. But this is the exercise of the power of vast economic and political significance. The wage mandate covers. . . How do we determine that? And we're taking you over. We'll give you some time for rebuttal. But this seems to be less than both. . . Clearly it's less than the Clean Power Act as far as economic significance. You'd agree with that. But what about the. . . Is it the Association of. . . Alabama Realtors. Yeah, Alabama Realtors. What was the economic impact there? Wasn't it $50 billion? Was that over a 10-year period or was that $50 billion? That was just that year, right? I don't know the exact number, but it certainly was some sort of a limited period of time because it was the CDC eviction moratorium. $1.7 billion sounds like a lot of money, but in the grand scheme of things, it's not that much money. Are we starting to lower the threshold pretty significantly? How do we evaluate that is what I'm saying. We've got tons of regulations that have $1.7 billion of impact in a given year. Sure. I don't think so because, one, I don't think there is any minimum price tag for the major questions doctrine to apply in the OSHA case, for example, which was the OSHA nationwide vaccine mandate. I don't think the cost would have been especially significant and the U.S. Supreme Court didn't talk about cost there. But the costs are more than $1.7 billion per year because there are spillover costs, which are going to be significant. The wage mandate, it does only apply to the hours that a contractor is spending on the contract, but the wage mandate rule acknowledges that it is very unlikely that contractors are going to be able to pay one employee one wage and then a lower wage to another employee doing the same thing who isn't working on the covered contract. So the expenses are significant, and it is also politically significant. The wage mandate followed by just one month, Congress's rejection of a $15 minimum wage. The Mays decision concluded that the major questions doctrine did not apply to the president. We disagree with that. The major questions doctrine is all about vindicating Congress's legislative power, and the executive is as able to go beyond the limits that Congress has imposed as any agency in the branch. And what do you make of the arguments from Franklin and Dalton that the president is not, he or she is not an agency, and so therefore I think that was one of the justifications that the Mays panel made for why it doesn't apply to a president's actions. Right, but those are both cases dealing with limitations that Congress put on the president's authority, whereas major questions cases deal with grants of authority that Congress has arguably made to the executive. Can I ask you a question about the APA? Yes. So there's an argument of whether the APA applies to an agency's implementation of a president's executive order, and I take it your argument is it should at least in some respect or completely. Ken, could we review something that the president has directed, you know, the $15 minimum wage itself? Is that reviewable under the APA in your view? So I think it's possibly a different case if the president is just directing a minimum wage period, but that isn't what happened here, because the president said $15, but then said Department of Labor, you figure out who this applies to, and please engage in rulemaking. And so our point on the APA is the president told the department to engage in rulemaking, and there just isn't anything in the APA that carves out policymaking by the president from a final agency action of the Department of Labor. And so when there's a play in the joints and there's some discretion that the agency is exercising, that is a reviewable thing under the APA? It is. It is. Okay. Thanks, counsel. Thank you. Good morning, Your Honor. May it please the court, Daniel Winnick for the federal government. I think there's three basic points I want to make in response to my friend's presentation. First, as to the sort of basic question of statutory interpretation. Second, as to the nexus, the sort of cost-benefit question. And third, as to the relevance of the other statutes. Let me start with the sort of statutory issue. This is really a key point. So the authority here, the affirmative grant of power to the president, is Section 121A, which says, quote, the president may prescribe policies and directives that the president considers necessary to carry out this subtitle. This subtitle being Subtitle 1 of Title 40 and parts of Subtitle 1 of Title 41, basically the government's general procurement and contracting authorities. That is the affirmative grant of power. We are not arguing, we have never argued, that Section 101 expands that power. Section 101 limits that power. Okay, so that makes sense to me, but you have to have something to go along with the grant of presidential role, I guess, right? A role to do what? So you've got all the provisions within this subchapter that he can regulate consistent with. So, yes, the key word there, Your Honor, is consistent with. So what Judge Grant said in her opinion in the Eleventh Circuit, which was not an opinion of the court, just a single judge opinion, is that the president's power is limited to carrying out specific provisions of the Procurement Act. That is at odds with the text of the statute, because if that's all it meant, Congress would not have gone on to say, and the president's directives must be consistent with this subtitle. I mean, I think that's right. I think that your reasoning is probably correct. The thing that I'm struggling with is what is the provision that you're relying on to say that this wage executive order is consistent with the Act? Because it can't just be the provision that says you can do anything consistent with the Act. Like, what is in the Act that that executive order is consistent with? I mean, I think there's basically two standards for whether a presidential directive is consistent with the subtitle. One is that it must be consistent with the statement of purposes in Section 101. So that's the sense in which Section 101 limits the power set forth in Section 101. Because it has to be economical. It has to promote an economical and efficient system. Correct, and if it doesn't do that, then it's not consistent with this subtitle. The second is that it can't violate any of the provisions of the Procurement Act. But if the president considers it necessary to carry out contracting, if he reasonably thinks that it advances the statutory purposes, and if it's not inconsistent with... Yeah, but what statutory purposes? I mean, I think we're coming back to the same thing. I think you're giving an incredibly broad interpretation of the statute. Anything that the president thinks is necessary, he can do. That is a broad interpretation of the statute. I don't think we think it's anything the president thinks is necessary. It has to be consistent with Section 101 and not inconsistent with the other provisions of the statute. But it is broad. Presidents have always understood it as broad. The courts have always understood it as broad. The only time courts have imposed this sort of narrow construction of the Act that plaintiffs are arguing for the first time on appeal is in presidential opinions of a single circuit, the Sixth Circuit, and a single judge... And the Eleventh Circuit. Yeah, not a president of the Eleventh Circuit. It's a single judge opinion not joined by any other member of that panel. Well, yeah, but the Eleventh Circuit, even the majority opinion still was... I read it as still to be pretty consistent with the Sixth Circuit opinion. I mean... But going back to the other cases that you say are so broad, Chau in 2003 and Friedman in 1981 from the Fourth Circuit, they still said it had to be reasonably related. And it focused, in the Fourth Circuit, on the cost to the federal government. So in addition to Chau and Kahn, the unbanked decision of the D.C. Circuit, and Mississippi Power and Light from the Fifth Circuit and Contractors Association of the Third Circuit. So I think that's sort of the canon of cases reading it broadly, including before Congress recodified it and presumably ratified those decisions. But to take Liberty Mutual specifically, that was not... Liberty Mutual was an as-applied challenge to the application of the nondiscrimination executive order to a particular contractor who had a highly attenuated relationship with federal contracting. It was providing workers' comp insurance on a sort of undifferentiated basis to both federal contractors and others. So all the Fourth Circuit said in that case is in that specific as-applied instance, we don't think there's a nexus. That decision does not create... Yeah, but they still focused, as did the D.C. Circuit, on the sufficient close nexus to the government cost. And I think that's my concern here, is that when you went into the cost-benefit analysis, you threw out a whole bunch of benefits that might... I mean, they could conceivably be benefits, depending on your policy views, but that doesn't seem to be what the statute governs. The statute governs... The whole point of the statute is to bring in government cost. Do you agree that the Department of Labor found that this will increase the cost to the government financially? So the answer to that is no, but let me step back for a second. So what the directive has to do, the president has to reasonably consider it necessary to promote economy and efficiency in federal contracting. That does not mean lowering the federal government's cost. It doesn't have to be...  I don't think that's right, Your Honor. I think Khan is a great example of that, but let me just sort of step back and talk about what it is that this executive order is doing. So suppose, just by analogy, suppose you are hiring a contractor to put a new roof on your house. You can pay the contractor $10,000 to do that job with employees making the prevailing wage, which is low, or you can pay that contractor a few hundred dollars more to do it with employees who are being well-paid, in your view. It is an eminently sensible decision, one that promotes economy and efficiency for you to pay more. I don't agree. No, that's just not true. That's not accurate. That is not economically... That is a policy judgment that you are getting outside of that. That is not promoting economy and efficiency. With respect, Your Honor, I disagree. The reason you would even just sort of as a normal person... I mean, your argument perhaps could be that because you are going to pay you more, you can get the job done faster. That makes sense to me. But the idea that, oh, I just want to pay more money because I want them to treat their employees better, that has nothing to do with economic and efficient systems. Your Honor, it's not just for the benefit of treating their employees better, and that's not what the President said and it's not what the Department of Labor said. The rationale is that workers who are paid more do higher-quality work. That benefits the government because the job is being done better. If it's your roof, maybe it needs replacement less soon. Maybe you have to do fewer repairs on it in the interim. It benefits you over the long run. That's not what your initial argument was. I'm following you a little bit better now, but you sort of said, oh, it's eminently reasonable to... I mean, but setting that aside, okay, so we've got the threshold question of whether... I don't see the other cases as going beyond looking at the cost to the federal government. You think Kahn says that. Your Honor, I think what they look at is the value to the federal government, and as Kahn says, that is measured in all sorts of things that the federal government considers in contracting, including the quality of what's getting. We're all sort of familiar with the idea, whether it's a roof or something else. You pay a little bit more to get a better thing that is a better value to you, is a more economical decision. The Department of Labor actually said... I didn't read the Department of Labor to make the argument you're making now. So let me speak to what the Department of Labor said, but if I could make quickly a point before that. The Department of Labor is not the one that decided $15 minimum wage. That's the president's decision. All the Department of Labor did was implement that. Now, there are some things in the rule that sort of explain why the president's judgment was reasonable, but it is the president who decided that a $15 minimum wage for people working... for the hours people spend on federal contracts is in the federal government's interest. That is the judgment. As to what the Department of Labor expected, they expected that the benefits to contractors of this requirement would be...the cost to contractors of this requirement would be offset by the benefits, like improved productivity and lower turnover. That's at page 67-152 of the rule. So they didn't actually expect that costs to contractors would increase on net. They then said at pages 67-206 to 207 of the rule that if contractors experienced any net increase in costs, and if they passed it through to the government, both of which are contingencies, then they expected any resulting increase in the government's contracting costs to be, quote, negligible and outweighed by the benefits to the government. So they said a lot of things, but they didn't expect there to be a net increase in costs for contractors because they thought contractors would benefit. And even if there was a net increase in costs for contractors, and even if contractors passed it through, they thought it would be a negligible increase in costs to the government, and they thought that the government would benefit on net because it would get a higher value. I don't see that second part, that they would get a higher value. The benefit that's being considered is not that the product is going to be better. And point to me something where the Department of Labor said that. What the Department of Labor said was, we value equality, we value treating everybody with respect. I don't think they tied it to, we're going to get a better product. With respect, Your Honor, I think that's... Show me where they said it. Quote it. The relevant parts of the rule are 67-206. Quote it to me. So, I mean, for example, Your Honor, the part of the rule where they're talking about the social science showing what happened at SFO, where there was a local wage ordinance like this one, where there were shorter security lines and higher customer satisfaction, I mean, there's a lot of things like that in the rule. What the rule is talking about at 152-206 to 207 and 212 to 214, it's that when workers are paid better, they have higher morale, they work with better productivity, they perform better services for the government, and in the case of the sum of contracts covered by this, for members of the public. Again, that's not the sort of... That is not the judgment that this court is reviewing. The Department of Labor didn't decide to have a $15 minimum wage for federal contractors. The president did, but the Department of Labor explained that that was a reasonable judgment by the president, and it was on the basis of the fact that when workers are paid better, they're going to perform better. That's why the president thought it was in the government's interest. Can we go back to the interpretive question for a minute? Yes. If 101 is not an operative grant of power, where does that leave you? The argument we're making is that 101 is not an operative grant of power. The operative grant of power is 121A. 101 is... Okay, so hold on. Yep. 121 says that the president may prescribe policies and directives that the president considers necessary to carry out this subtitle and that are also consistent with this subtitle. Yes. So if 101 isn't the sort of meaty provision, what provision do you have that this executive order is carrying out? It is carrying out — we don't think it is carrying out any specific provision of the Procurement Act. We don't think it is necessary to carry out a specific provision of the Procurement Act. If that was all the president could do, Congress wouldn't have gone on to include the consistent with language. I guess I don't understand that. I mean, we're a government of enumerated powers. So you're telling me that there doesn't have to be any sort of enumeration of power under this act that the president's executive order is necessary to carry out. It's just he — I don't even know. I don't even understand that argument. What is it connected to? It is necessary, in his view, to carry out government contracting writ broad. That is how courts have always understood it. Okay, so there's got to be a provision. There's got to be a provision that says that that's a scope of function under this act. And so which provision is it that you're relying on? The provision we're relying on is 121A. That's how every court until the Sixth Circuit and one judge — Okay, so I just want to make sure. That's just not true, counsel. I just want to make sure. And this is consistent with the way I read the briefing, is that the only provisions that you're citing is 101 and 121, and there is no other provision that you think is necessary to establish the president's authority in this space. Yeah, we're not suggesting that this order carries out a specific provision of the Procurement Act. We're suggesting that, consistent with the long history, it is necessary, in the president's view, to carry out government contracting in an economical and efficient way. And I would note, just sort of as a gloss on the statute here, the president has inherent power to manage the operations of the executive branch. So what Congress is doing here is not delegating legislative power. It's not saying, you know, go make regulations and we are delegating some power. But I guess that argument then would mean that you wouldn't even need the Procurement Act at all, and the president could just do this. We are not asserting that this is justified on the basis of the president's inherent power. I'm just arguing that, in terms of the lens through which you view the statute, it is relevant here that Congress is operating in a sphere where the president has inherent power. I guess I want you to be specific. Do you think that the president needs the authority, granted whatever it is, under the Procurement Act to do what he did or not? I don't have a position on that, Your Honor. I'm sorry. Okay. The executive order asserts the Procurement Act. That's the basis on which we're asking the court to hold that the order was within the president's power. I'm sorry. No, go ahead. So to ask the question that I asked your friend across the aisle, again, if we conclude that 101 does not describe the scope of authority and we conclude that 121, likewise, does not describe the scope of authority and that there needs to be some sort of substantive ground, you haven't cited any others. Do we have the authority to look all through the Procurement Act and find something that might work? I think you do have that authority. We're not asking the court to uphold the order on that ground. The argument we're making, which is, again, consistent with every decision addressing this except for the presidential decisions of the Sixth Circuit and one judge on the Eleventh Circuit, is that the president has power to issue directives he considers necessary to carry out government contracting in an economical and efficient way. So similar to my question to your colleague on the other side, I thought a potential answer might be that if you look at Title 41 and you see that there's the specific provision for contracting and there's another specific provision under 3306 that agencies that procure can include restrictive provisions. So these are general clauses, right? They're not specific to wage changes. But why isn't that a sufficient specific grant of authority that the president under 121 can then direct policy on so long as it's not inconsistent with the purposes of the Act? Yeah, I think it could be, Your Honor. I think that provision talks about how agencies go about contracting. And, you know, so our argument is that the president is directing agencies in the exercise of their contracting functions. So I think you could look at it that way. But you haven't argued that at any stage of this case. No, we haven't argued that. I frankly don't think that it's fundamentally different from what we are arguing, which is that — I mean, I don't disagree with Judge Sanchez. That's an interesting provision to me. So what — that's my question. What do I do with that? That you — there's a provision in there that might be a closer call, and you haven't relied on it. So should we? I think it's certainly in the court's discretion to do that. Again, I don't think that is fundamentally different from the point we are making. I mean, can I — I'm sorry, but part of the problem is, and this was what I asked Mr. Hamilton, was this was never properly briefed in the district court below. So we've never really gotten a full — you know, and in the middle of it, Mays v. Biden came out, and now that's since been vacated. So there are different circumstances that have perhaps not allowed the parties, or we've not gotten a full airing from the parties on the potential, you know, nooks and crannies of this argument about whether the president is authorized to do this under the Procurement Act. You know, would you agree or no? I mean, I think neither side has really, really briefed up this issue very well. So I'd certainly agree that because this was not raised in the district court by plaintiffs, the district court didn't address it in detail. We think that's a reason this court shouldn't consider it and should hold the order valid. But if the court wants further briefing on this, we're, of course, happy to provide that. Can I ask about the current status of the rule? So it's been enjoined in the Fifth Circuit only as applicable to three states, correct? Yes, the district court in Texas has enjoined it as enforced to three states. Yeah, and didn't the Fifth Circuit uphold an interim injunction or it denied a request to vacate the injunction pending appeal? No, we didn't make such a request. We just appealed the injunction. So it's just a district court injunction at this point. Yes. And the Tenth Circuit, they did issue an injunction pending appeal, correct? But that was a limited nature, only addressing the seasonal recreational parameters. Yeah, the seasonal records. Yes, exactly. So right now you're not enforcing this as to seasonal workers? As to seasonal recreational providers on federal lands. Okay, but you are enforcing it in the other 47 states other than the three states from the district court? Yes, and let me clarify. That injunction by the Texas district court is not don't enforce it as to anybody within these three states. It's don't enforce it against these three states in particular. So the requirement is enforced as to companies in Texas, Mississippi, and Louisiana. I see. Okay. Can I ask you about the APA claim? Yes. Is it your view that whatever the agency has implemented pursuant to the executive order is not reviewable under the APA? Or do you agree with counsel that if there are discretionary things that the agency undertakes, that that would be reviewable? Basically the latter. Our key point about the APA arguments they're making is most of what they're saying were not actually choices left open to the agency. So it wasn't left open to the agency to decide whether there should be a $15 minimum wage for federal contractors. The implementation date wasn't open to the agency, et cetera. Why was the implementation date not open? The executive order says effective as of January 30, 2022. So they had to get this done before then. Yes, and it specifies a rulemaking deadline for them. We agree the agency had power to create exclusions. The only argument, the only basis on which they've challenged the agency's exercise of that power is that the agency didn't create an exclusion from states, which is an argument nobody ever made to the agency. And so on that basis alone, that argument should be rejected. But, yes, we don't dispute that this rule is final agency action, that it's reviewable under the APA to the extent that the agency is making its own decisions. But overwhelmingly what the agency was doing here was implementing decisions the president made. But that's not what Franklin said. So you recognize you're asking for an extension of Franklin, right? I mean, Franklin said the president is not an agency, but they're not suing the president here. So you're asking for an extension to say because the president is not an agency, any mandatory actions by an agency, therefore, also can't fall within final agency actions, reviewable under the APA. I think that's basically right. Let me stress that our position is limited to the president's exercise of powers delegated specifically to him by Congress. So we're not suggesting that if Congress delegates legislative power to an agency and the president then tells the agency, you know, what he would like the agency to do, that that's not reviewable. Can you respond to the Wright case, though, from the D.C. Circuit where they held that, you know, rules adopted by an executive order are not insulated from APA review, even if they are basically an indirect challenge to the president's authority under the EO? So that's true, Your Honor, as to statutory authority. Nobody is disputing that this court can review whether the rule and through the rule the executive order is within statutory authority. What the court can't do is say, well, the agency implemented this $15 minimum wage and that took agency action, so we're going to review whether that was arbitrary and capricious. I see. The reason the court can't do that is that that would be effectively reviewing the president's own determination for arbitrariness and capriciousness. The only thing the court can review as to the president's determination is whether it's consistent with the statute and with the Constitution, but that's not an issue here. Let me just briefly respond, if I might, to the point about other statutes. I think the key to understand about the Davis-Bacon Act, Service Contract Act, and so forth, is that those are enacted for the benefit of employees. That's very clear. This court has said it. The Supreme Court has said it. So those are not statutes in which Congress was legislating to make sure that the government paid no more than necessary for, you know, projects it undertook. Those were enacted to make sure employees were not underpaid. So aside from everything else that's been said about how there's no inconsistency, they can both be complied with, there's no reason to read those statutes as reflecting Congress's judgment about the maximum amount that the government should pay for given contracts. Unless the court has further questions, we ask that the district court's judgment be affirmed. Thank you, counsel.  We'll give you three minutes for rebuttal. Thank you, Your Honor. I want to start with the economy and efficiency analysis. My friend on the other side compared the wage mandate to a contract for a house and its improvement. But the wage mandate imposes very significant costs on a per-covered employee basis. In our brief reply, sorry, in the reply brief at page 7, we note that the Department of Labor has said that covered employees are going to receive about $5,200 more per year. And it is simply unbelievable to think that the government is going to get $5,200 out of increased benefits from these workers' performance of the contracts. Also in the record is an affidavit from the Idaho Department of Fish and Game that explains how this actually affects that agency. They have a contract to improve salmon fisheries, and the DFG had to raise wages for about 100 covered employees as well as others at an expense of $880,000 in direct and indirect costs on a $20.5 million contract. That's a significant increase, and because the DFG is a government organization, it's going to have to use operating cost funds to offset that cost. The wage mandate rule does not explain how this is in the end going to actually offset the cost. On the three pages of benefits discussion in the rule, I don't think there's a single word that would change if we were talking about a $30 or $45 minimum wage as opposed to the $15 minimum wage. And I would just also point out, and this is a point that the Fifth Circuit makes in the Louisiana case, I didn't hear any limiting principle from my friend on the other side that would prevent the president from tomorrow saying that all contractor employees must take daily vitamins or exercise three times a week because then the federal government will have a more reliable contracting workforce, for example. If the court has no further questions, we ask this court would reverse the district court. Thank you. Thank you to both counsel for your arguments in this important case. The case is now submitted, and that concludes our session for today. All rise.
judges: NELSON, FORREST, SANCHEZ